[Civ. No. 16365. First Dist., Div. Two. Nov. 28, 1955.]

DIVISION OF LABOR LAW ENFORCEMENT, DEPARTMENT OF INDUSTRIAL RELATIONS, Plaintiff, v. MRS. ALBERT GIFFORD, Appellant; DOCTORS HOSPITAL et al., Respondents.

260

John B. Kramer and Hildebrand, Bills & McLeod for Appellant.

Lamb, Hoge & Killion for Respondents.

KAUFMAN, J.—This is an appeal from a judgment of the Superior Court of the County of Santa Clara decreeing that defendant and cross-complainant take nothing, and that cross-defendants have judgment for costs on cross-complainant's action for damages for performance of an unauthorized autopsy on the body of cross-complainant's deceased husband

by cross-defendant physician, and for negligence and malpractice causing his death.

A complaint for wages for certain nurses was filed against Mrs. Albert Gifford by the Division of Labor Law Enforcement of the Department of Industrial Relations. She filed an answer and a cross-complaint consisting of four causes of action, the first for negligence on the part of the cross-defendant Doctors Hospital through its agents, servants and employees in regard to facilities, care and treatment; the second against Doctors Hospital and cross-defendant Dr. Milton E. Denmark for performance of an unauthorized autopsy; the third for malpractice on the part of Dr. Denmark in advising surgery, in the performance thereof and in the postoperative care; the fourth was for negligence against cross-defendant Frances Faulkner, a nurse, who was alleged to be an agent and employee of Dr. Denmark and the Doctors Hospital.

Mr. Albert Gifford entered Doctors Hospital in San Jose, California, on January 30, 1952, under the care of Dr. Denmark. He was examined by Dr. Denmark and Dr. Irene Gayus. He was suffering from high blood pressure and a pyloric ulcer which was leaking into the pancreas. There appeared to be no severe heart damage at the time the operation was decided upon, and there was no abnormal condition detected in the kidneys. Dr. Denmark decided that a gastroectomy was necessary, and with his assistance this operation was performed on Mr. Gifford on February 1, 1952, by Dr. Denmark and his assistant, Dr. Kumera. Mr. Gifford was a man of 41 years of age; 5 feet 4 inches in height, and weighed 230 pounds. He had been treated for high blood pressure and obesity at Doctors Hospital in the autumn of 1951.

Following the operation, Mr. Gifford's condition was poor and thereafter became progressively worse. He died on February 9, 1952. Dr. Denmark stated that the cause of death was lower nephron syndrome which is kidney failure. There was testimony that the operation was normal and skillfully done.

There was medical testimony to the effect that decedent's very high blood pressure could cause kidney damage and that such a patient had less chance of recovery from this type of major surgery than does a patient with normal blood pressure. Fatalities after such operations average between 2 and 4 per cent.

Dr. Denmark performed an autopsy upon the remains, and testified that in his opinion death was due to a lower nephron syndrome. Dr. Gayus also participated in the autopsy.

The case was tried by the court without a jury. The court made detailed findings of fact on each cause of action. None of the alleged acts of negligence was found to be true, except that the special nurses did fail to chart all medicines administered. It was found that no acts or omissions of the cross-defendant Doctors Hospital contributed in any way to proximately cause the death of Albert Gifford. The court found that it was not true that Dr. Denmark performed the autopsy without the consent of Mrs. Gifford; that it was not true that Doctors Hospital or Dr. Denmark failed to disclose the results of the autopsy to Mrs. Gifford, nor that she was deprived of the means of establishing the cause of death of said Albert Gifford. As to the third cause of action it was found that there was no act of negligence on the part of Dr. Denmark or any failure to exercise the degree of skill ordinarily possessed by surgeons in the San Jose area or similar communities, in the performance of the operation, or in the care and treatment of Mr. Gifford. As to the fourth cause of action against the nurse Mrs. Faulkner, it was found that judgment in favor of Mrs. Faulkner had been stipulated to, and no proof of negligence on her part had been made.

The only one of the above findings of fact that is directly attacked as unsupported by the evidence is that Dr. Denmark performed the autopsy with permission. There is abundant evidence in the record to support the findings of fact that no negligence or malpractice on the part of Dr. Denmark or the hospital employees contributed to causing Mr. Gifford's death, and such findings could not therefore be directly attacked. Appellant's complaint is that the evidence on which these findings were based was so inconsistent, contradictory, evasive and incredible as to not meet the required standard of substantial testimony.

At the time this action arose, sections 7113 and 7114 of the Health and Safety Code dealt with the matter of autopsies. Section 7113 then read as follows:

"When autopsy permitted: Liability for autopsy. A cemetery authority or a licensed funeral director may permit an autopsy of any remains in its or his custody upon the receipt of a written authorization of a person representing himself to be any of the following:

"(a) the surviving spouse . . ."

Section 7114 of the same code provides:

"Performance of autopsy without written authorization.

"Any person who performs an autopsy on a dead body without first having obtained the written authorization required by Section 7113 of this code is guilty of a misdemeanor, except that this shall not be applicable to the performance of an autopsy by the coroner or other officer authorized by law to perform autopsies."

In 1955 section 7113 was amended to read: "A cemetery authority or licensed funeral director or a licensed hospital or its authorized personnel may permit or assist, and a physician may perform, an autopsy of any remains in its or his custody upon the receipt of a written authorization from a person representing himself to be any of the following: (a) The surviving spouse; . . ." Section 7114 was also amended to conform with the change in the foregoing section.

It is contended that since section 7114 was added in 1949, after an opinion by the attorney general of California in 1948 (11 A.G. 150) to the effect that oral permission was sufficient to permit a postmortem examination of a body in a veterans home, that it is clear that section 7114 required written authorization directly to Dr. Denmark in this case. However, even if section 7114 was enacted for that purpose, it does not appear to have accomplished it. A reasonable interpretation of the section is that it established a penalty for violation of section 7113, for it refers to performance of an autopsy on a body without the "written authorization required by Section 7113," and that section is concerned only with autopsies of remains in the custody of cemeteries or funeral directors. Since the 1955 amendments to these sections, it is now clear that written permission is necessary for all autopsies performed by doctors in hospitals or elsewhere. But even if it is assumed that written permission for the performance of an autopsy by a doctor in a hospital was required by the law as it existed at the time this case arose, it does not specifically require that the permission must run directly to the person performing the autopsy. If a funeral director had written consent to an autopsy by the spouse of a deceased person, certainly any doctor performing that autopsy would be within the law. In the instant case Dr. Denmark requested Dr. Gayus, with whom he worked on this case, and who was a personal friend of Mrs. Gifford, to get written permission. Both of them took part in the autopsy, although the writing mentioned only Dr. Gayus' name. How-

ever, Dr. Denmark had discussed with Mrs. Gifford the fact that he would want to perform such an examination if her husband did not survive, and she had consented. Dr. Denmark was a surgeon, and Dr. Gayus apparently was not practicing surgery. Dr. Gayus used stationery of Dr. Denmark's on which to have Mrs. Gifford record the written permission. The finding that Dr. Denmark performed the autopsy with Mrs. Gifford's consent is therefore adequately supported.

What the law is concerned with is that the body is not mutilated without the consent of the person having the right to its disposition. Appellant says that written permission is not required for a postmortem examination but is required for an autopsy, because an autopsy is an examination to determine the cause of death, and the state has concern for what caused a person's death but has less interest in an examination for other purposes. However, it is to be noted that where the state has reason to be concerned, as in cases where there is suspicion of death by criminal means, the coroner has the right to perform an autopsy without written permission. (Health & Saf. Code, § 7114.) The opinion of the attorney general cited by appellant clearly stated that section 7113 made it necessary for a cemetery or licensed funeral director to obtain a written authorization before permitting an autopsy, but not for a hospital. Despite this opinion, it was not until 1955 that licensed hospitals and physicians were included in the statute.

Appellant maintains that prejudicial error was committed in admitting in evidence Defendant's Exhibits A and B, two electrocardiograms which had been made after the operation. Appellant had subpoenaed all the medical records of Mr. Gifford from Doctors Hospital. The custodian brought these records but the EKG's were not among them. The custodian stated that it was the practice of the hospital to include the EKG tracings in the person's medical record if the patient was confined in the hospital at the time they were taken. Dr. Denmark testified that they were kept in the hospital records part of the time and in his own office in a locked file part of the time. He also stated that such tracings were the property of the physician who orders them, and may be kept in the physician's personal file.

It is difficult to see how appellant can seriously contend that she was prejudiced by the introduction of the EKG's by respondents. Immediately after the absence of the EKG's from the file was noted upon examination of the custodian of the records at the beginning of the trial, Dr.

Denmark was called by appellant under section 2055, Code of Civil Procedure. He was questioned at length about the EKG's that he had ordered; he stated that they had been referred to Dr. Hayden for his opinion, and discussed their value to a doctor in examination and treatment of this type of case. Appellant was aware of the existence of the EKG's at least since the taking of Dr. Gayus' deposition prior to trial. They made no request to see the EKG's when they were examining Dr. Denmark, nor did they ask him where they were then located although they then knew they were not in the hospital file. Dr. Ralph Hayden, a specialist in internal medicine, who had examined the electrocardiograms, was called as a witness on behalf of appellant. He stated that he recalled that the EKG's had shown heart damage, and that he definitely felt the deceased had coronary disease. He was then asked: "Now, I assume that you could give a much more complete analysis if you could see the tracings, could you not?" He answered, "Yes." If counsel was seriously interested in having the EKG's available to Dr. Hayden, he might have asked Dr. Denmark as to their whereabouts and availability. When the point was argued before the court, counsel for appellant accused respondents of concealing evidence. Counsel for respondents stated that Dr. Denmark had the cardiographs out when he was testifying under section 2055. The court took a short recess in order to go over his notes on some of the testimony, and upon his return ordered the exhibit admitted for identification. They were later admitted in evidence. Clearly, the court's ruling was correct, as under these facts no showing of prejudice was made.

Appellant contends that a hypothetical question on a material matter which was lacking in essential elements was permitted over objection. The following question was asked: "Doctor, assume for approximately four weeks, while Mr. Gifford, the hypothetical man we have been talking about, was confined at Doctors Hospital, that he had this blood pressure of 250, 280, over 140. Also, assume, Doctor, that he was discharged. He left the hospital and then returned again in January of 1952, for an operation for this ulcer; that at that time his blood pressure was approximately 220 over 130.

"Now, with those facts in mind, Doctor, and that time limit I have put on that, can you determine or could you say that that would have any effect on Mr. Gifford's kidneys?" Coun-

sel for appellant objected that there was no evidence in the record that Mr. Gifford had a blood pressure of 250 to 280 for a period of four weeks. Dr. Gayus, who had taken care of Mr. Gifford in his four-week stay at Doctors Hospital in the autumn of 1951, testified that he came to the hospital at that time suffering from hypertension and obesity. She was asked what was his blood pressure when admitted to the hospital, and she said "between 250 and 280 over, and the diastolic was about 140." Appellant says the basis of the objection is that there is no testimony that that was the blood pressure for the four-week period referred to, and that this was an attempt to establish kidney failure upon high blood pressure of long standing.

Although there is just the one reading for the four-week period referred to, there is abundant evidence in the record that the deceased was suffering from high blood pressure or hypertension during the four weeks of his first stay at the hospital. He was still suffering from it on his admission in January, 1952, though the reading was then somewhat lower. ■ It is true that hypothetical questions which are based on facts not shown by the evidence are not competent. However, minor variances between the facts assumed and the facts in evidence do not render the question incompetent. (19 Cal.Jur.2d 30-31, § 301.) In the case of *Forbis* v. *Holzman*, 5 Cal.2d 407 [55 P.2d 201], it was charged that error was committed in the asking of a hypothetical question which was not based on facts developed by the testimony. There it was assumed that the patient's blood pressure had been normal during the anaesthesia. Defendant's evidence pointed to a drop in pressure before death. It was said that the last blood pressure reading that had been taken had been normal, and that the exact time of cessation of respiration was not observed. Hence it was possible there had been no drop in blood pressure. The question was held not to be prejudicial. The court there cited with approval the case of *Treadwell* v. *Nickel*, 194 Cal. 243, 267 [228 P. 25], a case in which it was observed that considerable latitude is allowed in framing a hypothetical question. It appears that the question asked herein had sufficient background in the evidence. ■ Furthermore, even if incompetent, in a trial before the court it would not be deemed prejudicial, if other competent evidence in the record adequately supports the findings and judgment. (*Jaffe* v. *Vitz*, 84 Cal.App.2d 810, 813 [191 P.2d 802].) The findings in the case herein do not depend for their support upon this particular item of evidence.

■ Appellant contends that the testimony of Dr. Denmark was so evasive, contradictory, inconsistent and incredible as not to meet the requirement of substantial testimony, and cites *Herbert* v. *Lankershim,* 9 Cal.2d 409 [71 P.2d 220], to the effect that although an appellate court will not interfere when a judgment is entered where there is a substantial conflict in evidence, this rule does not relieve the appellate court from its duty of analyzing the evidence in the light of reason and human experience. This case does not, however, sanction a disregard of genuine conflicts in the evidence. (See *Roeder* v. *Roeder,* 118 Cal.App.2d 572, 582 [258 P.2d 581]; *Ventimiglia* v. *Hodgen,* 112 Cal.App.2d 658, 662 [247 P.2d 123].) Appellant herein has devoted some 30 pages of her brief to numerous short excerpts from the testimony of Dr. Denmark, and references to portions of testimony by medical experts to prove that the evidence establishes without substantial conflict that the patient died of shock because of insufficient administration of fluids. A chart is included to show that the total of fluids in the days following the operation totaled 2405 cc.'s less than the total intake. It is to be remembered that the trial judge found that the special nurses did not chart all of the medicines administered. Dr. Denmark tried to estimate at the time of trial, nearly two years after the patient's death, how much more fluid was given than had been recorded by the nurses, and these estimates were included in the chart. There was considerable testimony that the patient was so irrational and difficult during the last few days of his life that the nurses had difficulty in keeping him in bed, hence could not always chart items immediately. This condition also made it harder for the nurses to keep the intravenous fluid running. Dr. Denmark testified that considering the condition of the patient it was fortunate that any records were kept. Both doctors, Denmark and Gayus, visited the patient several times a day and talked with the nurses.

A reading of the record discloses substantial evidence supporting the trial court's finding that neither Doctors Hospital nor Dr. Denmark was guilty of negligence or malpractice in the treatment of appellant's deceased husband.

We conclude that the findings and judgment find support in the record before us.

Judgment affirmed.

Nourse, P. J., and Dooling, J., concurred.