[Civ. No. 18135. First Dist., Div. One. May 11, 1959.]

CROCKER-ANGLO NATIONAL BANK (a National Banking Association), Plaintiff and Appellant, v. AMERICAN TRUST COMPANY (a Corporation), as Executor, etc., Respondent; ANN GUIDOTTI, Defendant and Appellant.

Severson, Davis & Larson, Randell Larson and George Brunn for Plaintiff and Appella·

Mandl & Atteridge and Brown, Smith & Taber for Defendant and Appellant.

Paul I. Pioda, Raymond W. Shellooe and J. T. Harrington for Respondent.

BRAY, P. J.—Two appeals—one by defendant Ann Guidotti and the other by plaintiff. The nature of these appeals is hereinafter set forth.

## QUESTIONS PRESENTED

*A. Defendant Ann Guidotti's Appeal.*

1. Was a joint tenancy created under section 852, Financial Code?

2. Are the findings of fact supported?

*B. Plaintiff Crocker-Anglo's Appeal.*

Was it error to deny plaintiff's motion to deposit $39,304.99 in court and to allow interest on that sum?

## RECORD

Plaintiff filed a complaint in interpleader against defendants American Trust Company, as executor of the estate of Alfred J. Guidotti, and Ann Guidotti, which stated that it had $39,304.99 on deposit which sum was claimed by both defendants. Plaintiff prayed that defendants be required to interplead and that upon deposit by plaintiff of said sum in court, plaintiff be discharged from any and all liability to any and all of the defendants in relation thereto. Defendant American Trust as executor filed an answer and cross-complaint against plaintiff and defendant Ann wherein it sought the sum of $43,005.78 (the amount which at the time of Alfred's death was in the bank accounts hereafter discussed, plus certain interest). Plaintiff filed answer to this cross-complaint and a cross-complaint against defendant Ann Guidotti praying that in the event plaintiff should be required to pay defendant American Trust the sum demanded by said defendant, defendant Ann be required to repay plaintiff such sum. The court found that the bank accounts in question were not joint tenancy accounts, belonged to defendant American Trust as executor, that defendant Ann had no right therein, and gave judgment in favor of defendant American Trust against plaintiff in the sum of $43,005.78 plus interest from

September 27, 1956. It then gave judgment in favor of plaintiff and against defendant Ann in the sum of $4,922.82.

### FACTS

The controversy is whether certain bank accounts in plaintiff's bank at Salinas (formerly Salinas National Bank) were held in the joint tenancy of Alfred J. Guidotti, now deceased, and his wife, defendant Ann Guidotti. Alfred and Ann were married October 21, 1950, and lived as husband and wife until Alfred's death. At the time of marriage Alfred had standing in his name in the Salinas National Bank two accounts, one savings, the other commercial. In October, 1953, Ann's signature was added below that of Alfred on the savings account signature card. The bank's assistant cashier testified that Alfred came in to the bank and "wanted to have his wife added to that card so that she could withdraw funds and so that it would be a joint account, and so that if something happened that the account would go in her name." Ann then signed the card below Alfred's signature. The heading of the card "A. J. Guidotti" was not changed. A few days after the official had given Alfred a signature card headed "A. J. Guidotti or Mrs. A. J. Guidotti," Alfred and Ann came to the bank and signed it where indicated by the assistant cashier. This was for the commercial account. Thereafter Ann wrote checks on the commercial account. To impeach the assistant cashier defendant bank introduced his deposition in which after stating that Alfred "asked to have his checking account set up as a joint account with his wife" he was asked if Alfred said anything more. The witness answered "No" but corrected the answer to read "I don't remember at this time." To the question "Did he tell you the purpose for which he wanted that joint account set up" he answered "No" but corrected the answer to read "I can't recall right now." The witness explained the difference in his testimony at the deposition and at the trial by saying that he was upset at the former and could not think clearly. At all times the bank's ledger sheets for both accounts were in Alfred's name solely. The assistant cashier testified that in determining the relationship between the bank and the depositor, the bank depended on the signature card and not on the ledger or other bookkeeping items. The reverse sides of the signature cards containing forms for the creation of joint tenancy accounts were not signed by either party. Two Salinas National employees testified that the practice of the bank was rarely to use the reverse side of the

signature card, although instructions had been given by the bank that in the event a joint tenancy account was to be opened the reverse side of the signature card should be signed. Alfred had been the survivor of a joint account with his mother which had been set up similarly to the instant ones in that the joint tenancy portion of the signature card had not been signed. (There is a difference, however, in that the signature card of the mother's contained the notation "Two signatures required to withdraw funds.") Depositors in the Salinas bank were personally known to the officials and employees and accounts were opened, transferred or changed with informality. Mr. Corbin, an employee of the Salinas bank, testified that he overheard the conversation between the assistant cashier and Alfred. All that he could recall was that Alfred asked to have his wife's signature on his checking account "For the purpose of writing checks." Immediately thereafter Alfred asked the witness, "Will my wife have any trouble getting the money if anything should happen to me?" The witness told him "no," that the only thing that would be necessary would be the consent of the county treasurer. He then stated that in 1953 if a customer desired to open a joint tenancy account he would have had the signature card signed only on the front, and that on many occasions he had opened joint tenancy accounts that way. In fact his own joint tenancy account was set up that way. However, he testified that the employees were instructed in cases of opening joint tenancy accounts to stamp the signature cards with a rubber stamp reading "Joint Tenancy with Right of Survivorship." He had not known of this until after he opened many accounts and could not say whether the instructions were given prior to 1953, although it should have been the practice in 1953. Even after the instructions were given he and other employees did not always follow the instructions.

Ann's son, Gene Collins, testified that in 1955 Alfred told him that his mother was well taken care of in the event of Alfred's death. "[W]e have our joint banking accounts . . . is hers already because she will have—in case something should happen to me . . . ." Ann testified that Alfred told her he had made arrangements with the bank to set up joint tenancy accounts "for us," "that he thought it was best to set up a joint tenancy account in case that anything should ever happen to him that I would have money." After she signed the signature card, he said "That money is yours, in case anything ever happens to me, that money is yours." In another

hearing Ann stated that the first time the joint account was mentioned was when she told him she would need some money. He then said "I see no reason why you should not write checks yourself because I have had a joint account made out." She also testified that she did not know in 1953 or at all that Alfred had a savings account in the Salinas bank. In a deposition she said the first conversation on the subject was after she signed the signature card. On his returning home he told her that "he had made out joint accounts—joint savings accounts . . ."

Alfred died December 16, 1955. At that time there was $10,922.27 in the savings account and $32,083.51 in the commercial account—total, $43,005.78. In his will drawn in March, 1954, Alfred stated "I am the owner of certain accounts which I have maintained in the Salinas National Bank . . ." At that time as well as upon his death Alfred had at least two accounts in his name other than the two claimed to be joint tenancy accounts. (Unless otherwise designated all reference herein to accounts will mean the latter two accounts.) Three days after Alfred's death Ann and her attorney went to the bank and had the alleged joint tenancy accounts closed and the moneys transferred to Ann's individual account. On January 13, 1956, an officer of the American Trust Company, executor, inquired at the Salinas bank as to the status of accounts in Alfred's name. The assistant manager informed him that the accounts were joint tenancy accounts in Alfred's and Ann's names. The executor then listed them in the estate inventory as joint tenancy accounts. In September, 1956, defendant executor demanded of plaintiff Crocker-Anglo, which had succeeded to the ownership of Salinas National Bank, payment of the amounts which were in the accounts at Alfred's death, plus interest.

The court found that both accounts were the separate property of Alfred, and were not held in joint tenancy, that the pass books were at all times in decedent's possession, that Alfred did not inform Ann nor the bank at the time the cards were signed that he intended to transfer the funds in said accounts to a joint tenancy of himself and wife, or to create any joint tenancy; that the sole purpose of causing the name of his wife to go on the cards "was for a convenience in withdrawing monies from said accounts" and that defendant American Trust as executor was entitled to the $43,005.78 on deposit at Alfred's death with interest at 7 per cent per annum from September 27, 1956, the date defendant bank demanded payment from plaintiff. On that date plaintiff withheld from

Ann's account the balance of the $43,005.78 which it had theretofore transferred to her, amounting to $38,082.96, as Ann had withdrawn the difference, $4,922.82. Defendant bank as executor was awarded on its cross-complaint judgment against Ann for the latter amount.

A. DEFENDANT ANN'S APPEAL.

1. *Joint tenancy.*

Section 683, Civil Code, provides "A joint interest is one owned by two or more persons in equal shares, by a title created by a single will or transfer, when expressly declared in the will or transfer to be a joint tenancy. . . . A joint tenancy in personal property may be created by a *written* transfer, instrument or agreement." (Emphasis added.) It is obvious that there was no written transfer, instrument or agreement here. Therefore defendant Ann may not claim a compliance with said section. However, the section states further: "Provisions of this section shall not restrict the creation of a joint tenancy in a bank deposit as provided for in the Bank Act." The provision in the Bank Act to be considered here is section 852, Financial Code, which in part provides: "When a deposit is made in a bank in the names of two or more persons . . . in such form that the moneys in the account are payable to the survivor or survivors then such deposit and all additions thereto shall be the property of such persons as joint tenants."

Defendant Ann contends that this section was complied with (1) as a matter of law and (2) as a matter of fact.

Defendant Ann contends that the two signatures on the face of the signature cards coupled with the testimony of the bank employees that the practice was rarely to use the reverse side of the cards to create a joint account shows a complete compliance with section 852. Defendant Ann contends further that "in such form" does not require a writing, particularly as in the same section the Legislature made a requirement of a writing for a limitation on the right of a joint tenant to withdraw funds; and that the Legislature has left to the particular bank the determination of what the "form" shall be. It is not reasonable to assume that the Legislature in section 852, Financial Code, intended to leave to the banks the right to permit the creation of a joint tenancy orally. In view of section 683, Civil Code, "in such form" in section 852, Financial Code, can only mean that the bank may determine the particular form of writing, provided that it clearly indicates an intention of the declarant or de-

clarants to create a joint tenancy. The necessity for a clear written declaration of joint tenancy is shown by the decision in *California Trust Co.* v. *Bennett,* 33 Cal.2d 694 [204 P.2d 324], which dealt with a somewhat analogous situation, that of a claimed joint tenancy safe deposit box. There the court, although it did not discuss the effect of the Bank Act, must have had it in mind because it quoted section 683 including the provision that the creation of a joint tenancy in a bank deposit as provided for in the Bank Act should not be restricted (at that time the section of the Bank Act dealing with joint accounts was 15a and used the same term "in such form" as is in Fin. Code, § 852). In that case the decedent rented a safe deposit box in the bank, telling the clerk she wanted her husband to have access to the box and to have its contents if she should die. She then signed a signature card entitled " 'Co-Renters Agreement (Survivor to Have Exclusive Right of Access)' " which among other things provided for right of access by either co-renter without notice to the other and " '. . . Upon the death of either of us, the survivor is and shall for every purpose be the sole renter of said box, with the exclusive right of access thereto and possession of the contents thereof . . .' " (P. 695.) The decedent brought the card home to her husband to sign, telling him that if anything happened she wanted him to have the contents of the box. Her sister testified that decedent placed $8,000 " 'in her own box in the name of' " the husband. After holding that because of section 683, Civil Code, joint tenancies may be created *only* by a writing, the court held that this writing was not sufficient to create a joint tenancy. ▮ It then went on to discuss the same type of further contention that is made in our case (p. 699) : "It is asserted, nevertheless, that decedent's declarations and the circumstances surrounding the renting of the safe deposit box may be used to interpret the rental card, and that, when interpreted with this evidence, the card is sufficient to satisfy the statutory requirement of a writing. It is well settled that where a statute requires the formality of a writing for the creation of an interest in property, it must contain words indicating an intent to transfer such interest, and in the absence of words which could be interpreted to show such intent, no parol evidence will be admitted. [Citations.] In the present case, the rental card is clear and, as we have seen, it does not purport to affect the title to the contents of the box, but relates only to rights of possession and access. [Citations.] Accordingly, the parol evidence could not be used to amplify the

terms of the rental card so as to create a joint tenancy." In our case there likewise is no ambiguity in the writings that were signed, namely, the face of the cards. Both signature cards had printed on their faces "joint and individual." The obvious purpose of these words was to indicate that the card could be used for either an individual or a joint account. It in nowise is a declaration that signatures of more than one person placed thereon constitutes a declaration of joint tenancy.

Typed at the top of the savings account card was "A. J. Guidotti"; at the head of the commercial account card, "A. J. Guidotti or Mrs. A. J. Guidotti." Here, too, there was no declaration of joint tenancy or of payment to survivor. (Fin. Code, § 852, does not require statement of joint tenancy but does require statement of payment to survivor.) The language in *Opp* v. *Frye,* 70 Cal.App.2d 478 [161 P.2d 235], is applicable here (p. 485): "There is no merit in the contention that one of the findings, that funds deposited in the bank account opened in 1920 were not owned by these parties as tenants in common, is not supported by the evidence. While Mrs. Opp's name appears on the signature card that card contained no statement that she was a coowner of the account and it sufficiently appears that her signature was placed there sometime after the account was opened. A notation on the back of the card refers to Mr. Opp only. Moreover, the first three of the bank's ledger sheets in this account, covering a period of more than a year, contained only the name of Mr. Opp except that on the first one Mrs. Opp's name had been written in with a pen or pencil. A number of subsequent sheets contained only the name of Mr. Opp. There is no evidence that Mrs. Opp ever deposited any funds in this account . . . ."

In *Denigan* v. *Hibernia etc. Society,* 127 Cal. 137 [59 P. 389] Ellen Denigan deposited certain moneys which were her separate property, in an account, receiving from the bank a pass book entitled " '. . . Frank Denigan or Ellen Denigan in account with . . .' " the bank. The court held (p. 141): "The form in which the deposit was made is entirely consistent with a desire on the part of the wife to give to her husband authority to withdraw money from the bank from time to time as she might need it, and it should not be held that she intended to part with her title thereto by reason of an ambiguous phrase, which is quite consistent with a contrary purpose."

While there was evidence that individual employees of the bank did not always follow the practice required, the bank had instructed its employees that when a joint tenancy account was desired the signature cards should be stamped "Joint Tenancy with Right of Survivorship" with the stamp provided for that purpose. Even were it bank practice to require no writing, such practice could not supersede the law. Moreover, it appeared that the bank had provided the reverse side of the card with a proper writing which would comply with both section 683, Civil Code, and the Bank Act. This writing was, in effect, the bank's endeavor to supply the "form" mentioned in section 852, Financial Code.

*Young* v. *Young* (1932), 126 Cal.App. 306 [14 P.2d 580], is not in conflict with our ruling. There, prior to the amendment of section 683, Civil Code, in 1935, requiring that the creation of a joint tenancy must be in writing, the court held that a joint tenancy in personal property could be created by an oral agreement. By the 1935 amendment such is no longer the law. As dicta, the court said: "Even to establish a joint tenancy account in a bank under the Bank Act, *a formal agreement between the depositors* is not necessary." (P. 311; emphasis added.) We are not holding that as to a bank account a formal agreement between the depositors is necessary. We are holding that the requirement of section 852, Financial Code, that the deposit in bank "in such form that the moneys in the account are payable to the survivor" is that there be a writing to that effect. ██ This writing need not be the agreement creating a joint tenancy between the parties required by section 683, Civil Code, but it must be a writing in such form as to show that the deposit is intended to be payable to a survivor.

*2. Findings.*

Defendant Ann contends that in any event the evidence brings the case within the rule that where a joint tenancy fails for technical reasons, the property becomes that of the survivor under a trust theory. (See *American Bible Soc.* v. *Mortgage Guar. Co.* (1932), 217 Cal. 9, 13 [17 P.2d 105]; *Drinkhouse* v. *German S. & L. Soc.* (1911), 17 Cal.App. 162 [118 P. 953].) She then contends that the findings which negative any intention of Alfred to create a joint tenancy are not supported by the evidence, but that the evidence as a matter of law shows such intention. If the evidence is conflicting, we, of course, may not disturb the trial court's

findings. (*Estate of Teel* (1944), 25 Cal.2d 520 [154 P.2d 384]; *Ventimiglia* v. *Hodgen* (1952), 112 Cal.App.2d 658 [247 P.2d 123].) ██ After an examination of the record we cannot say that there is no conflict nor that as a matter of law a joint tenancy was intended to be created by Alfred. In the written statement the assistant cashier said concerning the signing of the saving account card by Ann, "It was my understanding that it was to be used in the business. If he was away she could draw out money for the business. I do not recall any other conversation by either of them. Regarding the checking account, it was the same understanding; she could draw money out if needed . . . There was no other conversation about the accounts. Nothing was said about survivorship." His testimony in his deposition was to the same effect. The conflict between his testimony at the trial and his statement and deposition was a matter for the trial court and the inconsistencies were such that the trial court was justified in giving little, if any, weight to his trial testimony.

██ Defendant Ann contends that the statement was hearsay and not admissible. However, no objection was made to its introduction in evidence. Material evidence which is technically inadmissible under an exclusionary rule, if offered and received without objection, may be considered in support of the judgment. (*Powers* v. *Board of Public Works* (1932), 216 Cal. 546, 552 [15 P.2d 156]; see also Witkin, California Evidence, p. 751, § 723.) ██ The weight to be given to Ann's self-serving testimony and that of her son Collins was again a matter for the trial court. The testimony of Corbin, in view of the circumstances of the case, did not have to be accepted by the trial court, nor if accepted did it necessarily establish that Alfred intended his wife to have the right of survivorship. The trial court had the right also to consider the circumstances of the creation and the form of the accounts and Ann's contradictory statement in a collateral proceeding. The burden of establishing a joint tenancy was on defendant Ann. Having failed so to do the finding that it was not Alfred's intention to create a trust or joint tenancy was supported.

B. PLAINTIFF'S APPEAL.

*Denial of Deposit in Court.*

██ Plaintiff filed a notice of motion for an order authorizing it to deposit in court the sum of $39,304.99 which it

held in its possession after stopping payment of the balance in Ann's account, which was that sum. The notice stated that plaintiff would also move for an injunction restraining the other parties from taking any proceedings or action "in relation thereto" and for an interlocutory decree for the discharge of plaintiff "from any and all liability in the premises" to the parties. The motion when made was denied, apparently upon the ground that plaintiff's offer to deposit was conditioned upon a complete discharge, while the amount offered was not the whole amount in dispute. Section 386, Code of Civil Procedure, provides: ". . . The amount which plaintiff or cross complainant admits to be payable under a contract may be deposited by him with the clerk of the court at the time of the filing of the complaint or cross complaint in interpleader without first obtaining order of the court therefor." The section then provides that interest on the amount deposited shall cease to accrue after the date of deposit. Plaintiff did not purport to deposit under section 386, which apparently permits a partial deposit, that is, a sum which the party admits it owes but which is less than the amount claimed by the opponent, for two reasons: (1) it made no deposit at the time of filing the complaint or cross-complaint as required by the section; (2) a reading of the notice of motion indicates clearly that the making of the deposit was conditioned on the court granting plaintiff a complete discharge and the granting of an injunction prohibiting defendants from taking any action or proceeding against plaintiff concerning defendants' claims. This, of course, the court could not do, as defendant American Trust was claiming (and eventually succeeded in its claim) that $43,005.78 was due from plaintiff and not only the $39,304.99 which plaintiff offered to deposit. The record fails to show that plaintiff at any time offered to make a partial deposit. Thus, the court properly denied plaintiff's offer to deposit.

For the same reasons, the court properly allowed interest on the total sum of $43,005.78 from September 27, 1956, the date demand for payment was made by defendant bank upon plaintiff. (See Civ. Code, § 3287.) Had plaintiff offered to make a partial deposit, and had it been refused, interest could not accrue thereafter on the amount of the partial deposit offered. But this was not done.

Subsequent to the denial of said motion plaintiff filed a cross-complaint against defendant Ann in which it prayed that the court designate a person to receive "the funds re-

ferred to in the Complaint'' and that upon delivering ''the funds referred to'' to such designated person, plaintiff be discharged from all liability to defendants. The ''funds'' referred to in the complaint is the sum of $39,304.99, not the whole amount claimed by defendant bank. Again, no offer was made to deposit said sum as a partial deposit under section 386. No action was taken by the trial court on the offer in this cross-complaint. It is not clear whether the offer was called to the attention of the court. However, if it were, the court would have been required to deny it, as it, like the offer in the motion, was conditioned on a discharge of plaintiff.

The judgment is affirmed.

Wood (Fred B.), J., and Hanson, J. pro tem.,* concurred.

A petition for a rehearing was denied June 9, 1959, and the opinion was modified to read as printed above. Appellants' petitions for a hearing by the Supreme Court were denied July 8, 1959.

*Assigned by Chairman of Judicial Council.