[Crim. No. 130. Fifth Dist. Mar. 16, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. CARL CAMPBELL, Defendant and Appellant.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

William C. Hahesy, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Raymond M. Momboisse and Roger E. Venturi, Deputy Attorneys General, for Plaintiff and Respondent.

CONLEY, P. J.—This case involves the grisly death of a Negro laborer, who was a citizen of Tulare. On the last day of the year 1963, after a period of concentrated drinking, Hugh McCarthur died from a massive traumatic skull fracture and severe burns. There is ample evidence, the truth of which we must accept on this appeal inasmuch as the jury found him guilty (*People* v. *Sweeney*, 55 Cal.2d 27, 33 [9 Cal. Rptr. 793, 357 P.2d 1049]; *People* v. *Caritativo*, 46 Cal.2d 68, 70 [292 P.2d 513]), that the defendant, Carl Campbell, one of the decedent's drinking companions, was criminally responsible not only of fracturing the decedent's skull, but of attempting to dispose of the body by burning; unless there was prejudicial error requiring a reversal, the judgment of voluntary manslaughter must be affirmed. The attorney rep-

resenting the defendant does not contend that the evidence is insufficient to warrant the conviction.

As Carl Campbell, charged with the murder (Pen. Code, § 187), did not have the means to hire an attorney, the court appointed the Public Defender of Tulare County to represent him at the trial. The case was submitted to the jury, after a six-day hearing, on the stipulated alternatives of a verdict of murder in the second degree, manslaughter, or not guilty. The jury found the defendant guilty of voluntary manslaughter, an offense included within the charge of murder (Pen. Code, § 192, subd. 1).

During the last day of the year, Junius Deville (sometimes called Julius Deville by various witnesses), Lonnie (also called Berl) McCarthur, Carl Campbell, and Hugh McCarthur began drinking early in the morning in the McCarthur home at 933 South ''Q'' Street in Tulare; the McCarthur brothers and Junius Deville lived there; Berl McCarthur was a cripple, having previously lost a leg; Carl Campbell was a friend and frequently visited the others; those of the group who were able to work were engaged in casual day labor, such as picking cotton, but the day was too wet and gloomy to justify their labor on that day. The men spent the day in drinking liquor which was purchased on the credit of Berl McCarthur. They did some cleaning about the house, and cooked a meal consisting of chicken and beans, of which they ate at various times.

With the consent of Carl Campbell, the owner, Junius Deville and Berl McCarthur took a broken television set to the home of a repairman who agreed to fix it. Later, the two left the McCarthur house and drove several blocks away to that portion of Tulare where there were persons seeking entertainment at bars and pool rooms; when they left the home, they testified that Hugh McCarthur was locked inside the house and Carl Campbell was outside, dressed only in a T-shirt, levis, socks and shoes; they testified that Junius Deville locked the front door and also placed a padlock on the rear door. The two men returned a relatively short time afterwards at about 7 p. m. and, as Junius Deville tried to open the padlock on the back door, the hasp fell to the floor, and when Junius went into the house he was aware of smoke and immediately thereafter found Hugh McCarthur lying on the floor in the front room with his head and shoulders away from the open connecting doorway of the kitchen; the victim was dead; he showed evidence of severe burns in three sep-

arate places. Berl poured water from the kitchen over the body which was lying on the right side with a smouldering cotton jacket piled beside the head and shoulder. A heater hose, which had been detached from a coupling on a stove in the front room and which entangled a broom partially above the coils of the hose and partially below them, was still attached to the petcock at the side of the room from which the gas could flow. The end of the 7- or 8-foot hose, uncoupled from the heater, lay beneath the jacket.

The police were called and made a thorough investigation. The autopsy established that Hugh McCarthur had died from a combination of severe burns and blows to his eyes and the back of his head which had resulted in a massive skull fracture. The padlocked rear entrance to the house had been forced open by someone; five separate fires had made their marks on the woodwork of the room, and the victim's body had been subjected to three separate and unconnected fires; obviously, such burning was not the result of an accident.

When Junius and Lonnie left the house, the victim was lying on the sofa as a result of his heavy drinking (his blood-alcohol content, ascertained after death, being .300). Defendant was seen shortly after 7 p. m. on "P" street dressed in his overcoat, a brown sport coat, red shirt (all of which had been allegedly locked in the house when Berl and Junius had left there) besides levis, shoes and socks. His levis were soaked with blood and water, and the hem of the overcoat had blood on it; his shoes showed traces of blood and were water soaked. The rather rare type of these blood samples was the same as the victim's. The knuckles of the appellant's right hand were swollen and there were traces of blood between his fingers; his alcohol blood content, measured later, was .208. The brown sport coat worn by the defendant belonged to the victim and had been taken from the back bedroom closet.

Defendant contended that when Berl and Junius left he had gone back to the house, had entered when he found the front door unlocked, that while he was inside, on two separate occasions he had picked up the victim from the floor where he had fallen as a result of intoxication and had placed him on a bed in the back bedroom; he denied any knowledge of the victim's death; the blood and water inferentially got on his clothes and the blood on his hands when he picked up the fallen decedent and carried him to the bed; he got the additional clothes from the closet with the consent of the decedent. The defendant's account of what he did, or did not do, was consistent from the start.

Appellant claims that the court committed prejudicial error by admitting People's exhibits 5, 6, and 7, photographs which showed the body of the decedent in an "excruciating [burned] condition," because such exhibits were "purely cumulative," citing *People* v. *Burns,* 109 Cal.App.2d 524, 541 [241 P.2d 308, 242 P.2d 9]. Of course, it is improper to introduce gruesome pictures which contribute nothing toward the solution of the evidentiary problems involved in a criminal case, and which are produced for the sole purpose of shocking or disgusting the jury. However, the question of the admissibility of offered photographs because their probative value as evidence outweighs any probable prejudicial effect rests primarily within the discretion of the trial court, and if they add to the thrust of the evidence and thus help the jury to ascertain the truth, a ruling admitting them will not be disturbed on appeal. (*People* v. *Modesto,* 59 Cal.2d 722, 734 [31 Cal.Rptr. 225, 382 P.2d 33]; *People* v. *Lindsey,* 56 Cal.2d 324 [14 Cal.Rptr. 678, 363 P.2d 910]; *People* v. *Atchley,* 53 Cal.2d 160, 168 [346 P.2d 764].) Service on a murder trial jury is not entertainment; such duty is serious and onerous; by serving, the jurors are executing a primary and necessary duty as citizens. Often the details of evidence are unpleasant, but adult finders of fact must face this duty calmly and undismayed. The photographs which were introduced by the prosecution tended legitimately to establish that three areas on the body of the decedent were subjected to humanly induced fires, and that there were separate fire spots located in the room containing the body; even though certain of the details may have been cumulative, we cannot interfere with the discretion of the trial court in admitting them in evidence.

The testimony of the witness, Fred H. Wynbrandt, a criminalist with the State Department of Justice, is objected to. His qualifications are not questioned; the area of objection is restricted to the fact that he testified with respect to a gas heating stove and the use of natural gas. Appellant claims that there is nothing in the record which indicates that the type of fuel used in the McCarthur home was natural gas. This objection seems to be a wholly false quantity in view of the fact that it was not even mentioned by way of objection at the trial.

If any objection is made to expert testimony, it is for the trial court to determine whether or not a proper foundation has been laid. If defendant's counsel believes that the

evidence sought to be introduced has not had a proper foundation proven for it, his fundamental duty is to object on that ground to the proffered evidence. From the lack of objection by the public defender it may be inferred that he realized that everyone involved knew that natural gas was the type of fuel used in Tulare. Besides, there are numerous places in the reporter's transcript where witnesses refer to the use of ''gas'' in Tulare and there is definite evidence that the heating stove in question was one designed for the use of gas.

The trial court has a broad discretion to decide whether to admit evidence of an experimental nature and whether or not a proper foundation has been laid. (*Yecny* v. *Eclipse Fuel Engineering Co.,* 210 Cal.App.2d 192, 204-205 [26 Cal. Rptr. 402]; *Odell* v. *Frueh,* 146 Cal.App.2d 504, 511 [304 P.2d 45, 76 A.L.R.2d 345].) It is difficult to believe that the judge owed some hazy duty to interfere with the testimony of the expert witness in the total absence of any objection.

Generally speaking, failure to object at a trial is equivalent to a waiver of any claim of error in the admission of evidence (*People* v. *Modell,* 143 Cal.App.2d 724, 731 [300 P.2d 204]).

The appellant alleges also that the district attorney committed prejudicial error by asking too many leading and suggestive questions. The Attorney General's brief states that objection to the form of the questions asked by the district attorney was made at only one time and on that occasion that the district attorney withdrew his question and properly reframed it. It is not claimed that objection was often made to the form of the district attorney's questions or that the court on its own motion should have admonished the district attorney to use a different method of questioning. The rule against asking leading questions, that is to say questions which suggest an answer or constitute instruction to a willing witness (*People* v. *Mora,* 139 Cal.App.2d 266, 272 [293 P.2d 522]; Code Civ. Proc., § 2046), does not apply stringently in non-controversial matters, or when it is legitimate to employ some suggestion to refresh a witness's memory, or when an expert witness is being interrogated or when exhibits are being identified (*Bruce* v. *Western Pipe & Steel Co.,* 177 Cal. 25, 27 [169 P. 660]; *People* v. *Mora, supra,* 139 Cal.App.2d 266, 272; *Chula* v. *Superior Court,* 109 Cal.App.2d 24, 38-39 [240 P.2d 398]; *People* v. *Mason,* 86 Cal.App.2d 445, 455-456 [195 P.2d 60]; *People* v. *Wilson,* 46 Cal.App.2d 218, 224 [115 P.2d 598]).

■ An attentive reading of the record fails to show any excessive use of illegitimate leading questions or any prejudicial results therefrom. And even if there were a different record in that respect, it would scarcely be proper for counsel to insist upon such an objection for the first time on appeal (*People* v. *Wilder,* 151 Cal.App.2d 698, 707 [312 P.2d 425]; *People* v. *Whitholt,* 77 Cal.App. 587, 588 [247 P. 245]).

■ It is also urged that the district attorney was guilty of prejudicial misconduct when he asked one of the state's witnesses, William Jackson, who ran an establishment containing pool tables, whether he had had any trouble with the appellant on the night of the homicide after it had been committed. The objection made below was that the question was incompetent, irrelevant, and immaterial, and thereupon the prosecution withdrew the question. There is no indication that the district attorney asked the question for the purpose of creating prejudice against the defendant. The case at bar involved an inquiry by the jury whether the crime, if it were committed by defendant, constituted second degree murder or manslaughter. Murder, of course, involves malice aforethought, and the mental state of appellant at the time of the killing, or shortly afterwards, was important. Whether the defendant had committed the murder a few minutes before, or whether he in fact knew nothing about it and it was an accident, or the result of a crime by someone else was for the jury to determine. The attitude and state of mind of the defendant in the short period following the death was a legitimate factor in determining the presence or absence of criminality. The viewpoint of the district attorney, therefore, was not improper and no prejudicial error can be premised upon what occurred.

As might be expected at this point in juridical history, defendant's appellate counsel invokes the principle referred to in *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]; *In re Lopez,* 62 Cal.2d 368 [42 Cal.Rptr. 188, 398 P.2d 380]; *People* v. *Modesto,* 62 Cal.2d 436 [42 Cal.Rptr. 417, 398 P.2d 753]; *Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977]; and *Massiah* v. *United States,* 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246]. The authorities above cited enunciated constitutional principles as to which everyone in the United States has an equal right. Those principles, like the ''gentle rain from heaven'' which alike falls upon the just and the unjust, make no distinction with respect to beneficiaries. But it is also obvious that the constitutional

bill of rights is not designed to free guilty people; it is established, rather, to assure a fair and impartial trial to every accused person.

While there is presently no distinction in California as to the impact of constitutional rights as between confessions and admissions establishing an essential fact or element necessary to prove guilt (People v. Atchley, supra, 53 Cal.2d 160, 170), there are situations in which minor or incidental statements by a person accused of crime may not constitute reversible error. As is said in the opinion in People v. Dorado, supra, 62 Cal.2d 338, 356: ". . . under some circumstances the introduction into evidence of statements obtained from a defendant during police interrogation in violation of his right to counsel and his right to remain silent may constitute harmless error. . . ."

We think that the special circumstances are present here. The essential inquiry is whether a defendant has made such admissions freely and voluntarily, and, beyond that, whether the defendant has had a fair trial.

In this case, it is apparent from an intensive reading of the record and a common sense consideration of all of the factors involved, that the defendant made what amounted to a free and voluntary statement, and that he did have a fair trial. It is true that there is no specific or affirmative evidence that he was advised by the law enforcement officers that he could remain silent and that he had the right to the services of an attorney. On the contrary, there is nothing positively shown as it was in the Escobedo, Dorado, and other similar cases, that there was in fact a preceding lack of such preliminary advice by the police officers.

The defendant's statement was taken on tape at the jail on the day following the tragedy. It is not claimed by him or anyone else that he was subjected to pressure or abuse, physical or mental, or that he was made any promises for a statement of facts within his knowledge relating to the death. However, if we assume that no such warnings were in fact given to the defendant, we must keep in mind that the record shows positively that the minor or incidental admissions which were made before the officers had also been made freely by him on the same day to his drinking companion, Junius Deville. The incidental or inferential admissions on the tape were that he had been in the dwelling house after Berl and Junius had left for a different part of town, that he had twice lifted the decedent from the floor where he had fallen as the result of his drinking, and had placed him on a couch

or bed, and that he had worn some of the decedent's clothing by consent. The defendant stated that he had not broken any locks, but had entered the house freely through the front door and that he had acted throughout as a friend of the dead man. This same statement of his claim of the essential happenings was given on the day following the tragedy to Junius Deville, who had no connection with the arresting officers, or with any one else involved in law enforcement. The witness, Deville, testified to these incidental admissions prior to the tender of the tape in evidence.

In addition, it was established that, after the brother of the decedent and Deville had locked the front and rear doors of the home with the decedent inside and the defendant outside, the defendant appeared in the "P" street area wearing a brown sport coat of the decedent which had been located in a closet of the house; this showed conclusively that the defendant had been in the house. There were, therefore, two lines of proof aside from the inferential statement on the tape that the defendant had been inside the McCarthur home after Berl and Junius had left for town; the statements on the tape were *not something* unique; the *same* essential factors had been previously proven by other evidence.

Lastly, no objection was made to the reception of the tape in evidence. Ample—in fact even excessive—opportunity was afforded to defendant's attorney to make any objection he deemed proper if he were disposed to do so. On the day prior to the introduction of the statement in evidence, the trial judge insisted that defendant's counsel must preliminarily hear the entire tape so that he could make any objection that he thought it proper for him to make. On the following day, defendant's attorney stated in open court that he had become familiar with the entire contents of the tape, and that he was satisfied; he made no objection of any kind to its receipt in evidence.

In an adversary proceeding such as a criminal trial, the side which later claims that error was committed must object to the reception of questioned evidence or other procedure; a failure to do so is normally considered a waiver of any objection. (*People* v. *Ibarra,* 60 Cal.2d 460, 462 [34 Cal.Rptr. 863, 386 P.2d 487]; *People* v. *Lopez,* 60 Cal.2d 223, 249 [32 Cal.Rptr. 424, 384 P.2d 16]; *People* v. *Wilson,* 60 Cal.2d 139, 146-148 [32 Cal.Rptr. 44, 383 P.2d 452]; *People* v. *Hyde,* 51 Cal.2d 152, 157 [331 P.2d 42]; *People* v. *Richardson,* 51 Cal.2d 445, 447 [334 P.2d 573]; *People* v. *Jordan,*

45 Cal.2d 697, 708 [290 P.2d 484]; *Dryer* v. *Dryer,* 231 Cal. App.2d 441, 451 [41 Cal.Rptr. 839]; *People* v. *Gurrola,* 218 Cal.App.2d 349, 354 [32 Cal.Rptr. 368]; *People* v. *Hernandez,* 197 Cal.App.2d 25, 31 [17 Cal.Rptr. 20]; *People* v. *Prado,* 190 Cal.App.2d 374, 378 [12 Cal.Rptr. 141]; *Crocker-Anglo Nat. Bank* v. *American Tr. Co.,* 170 Cal.App.2d 289, 299 [338 P.2d 617]; *People* v. *Ryan,* 140 Cal.App.2d 412, 423 [295 P.2d 496]; *People* v. *Gonzales,* 69 Cal.App. 609, 613 [231 P. 1014]; Witkin, California Evidence, § 700, p. 832, § 723, pp. 751-752, 1963 Supplement, § 700, p. 270, § 723, p. 272.)

As is said in 3 California Jurisprudence, Second Edition, Appeal and Error, section 140, page 604: ''It is a general rule of appellate review, early established and long adhered to, that questions not raised in the trial court will not be considered on appeal.''

And this familiar rule is thus phrased in 4 Corpus Juris Secundum, Appeal and Error, section 228, page 665: ''Generally, . . . questions, of whatever nature, not raised and properly preserved for review in the trial court, will not be noticed on appeal; . . .'' and is supported by a note containing citations from jurisdictions throughout the United States including over 50 from California.

The recent opinion in *In re Lessard,* 62 Cal.2d 497, 503 [42 Cal.Rptr. 583, 399 P.2d 39], states: ''A failure to object to the introduction of evidence which defendant alleges was illegally obtained precludes the successful presentation of the issue at the appellate level.''

The cases relied upon by counsel normally deal with situations where the point was clearly made at the trial by objection and the adverse ruling was then charged as error on appeal. In the *Dorado* case, *supra,* 62 Cal.2d 338, 344-345, there had been an objection to the admission in evidence of the confession in the trial court and the lower court had overruled the objection. In *Modesto, supra,* 62 Cal.2d 436, it seems apparent that objection was made at the trial to the admission of the questioned statements (*People* v. *Modesto, supra,* 59 Cal.2d 722, 733). The *Escobedo* case, *supra,* 84 S.Ct. 1758 ruled on an objection to the evidence made during the trial (see: *People* v. *Escobedo,* 28 Ill.2d 41 [190 N.E.2d 825, 827].)

In the instant case, the record is even consistent with the thought that counsel for defendant desired that the evidence in question should be received. For the only reasonable de-

fense which the defendant could have hoped to establish was that he actually entered the house in a normal fashion through the front door, that the decedent was staggering drunk and fell one or more times during a search by him for more liquor; that the decedent's skull was fractured as the result of one of the falls; that the defendant in kindness twice picked him up and laid him on a bed; that blood and water got onto the defendant's hands and clothing when he was thus acting as a good Samaritan, and that the fatal result arose from an accident or the wrongful act of an interloper rather than through a criminal assault by him. This in fact proved to be his defense when he took the witness stand and described, in great detail, all of the alleged events of the fatal day. In order to show that this was not a last-minute invention on his part, it was advantageous to defendant to prove that as early as the day after the death he had told the officers charged with investigating the crime the same story that he consistently vouched for at all times thereafter. During his recital of events on the tape and in his testimony on the witness stand, he denied that he had ever struck the decedent, caused his death, or burned his body, or that he had taken any clothes that he did not have permission to take, or that he had gotten blood on his hands and clothing as the result of a criminal assault. The tape did not include a confession or the admission of any primary factor necessary to prove his guilt; he denied at all times that he was responsible for the death.

It seems clear to us that the statement made by the defendant was in effect voluntarily made, that it was not a confession or an admission of any fact or element necessary to establish the crime, and that because his attorney failed to make any objection to the offer of this evidence in the court below and announced that he was satisfied, no error warranting a reversal of the judgment was committed. A defendant's rights under the Sixth and Fourteenth Amendments to the United States Constitution, and under similar safeguards contained in the Constitution of California, are not designed to do away with other time-honored features of a criminal prosecution; there is no necessity on the part of an appellate court at least in the circumstances shown by the record in this case, to invoke principles which were not urged in any form or made the basis of objection in the court below. The Public Defender of Tulare County acted ably for the defendant during the lengthy case; we believe that Carl

Campbell received a fair trial and that the judgment of conviction should be upheld.

The judgment is affirmed.

Brown (R. M.), J., concurred.

STONE, J., Concurring and Dissenting.—I have no quarrel with the affirmance in this case, but I must dissent from that portion of the majority opinion holding that failure to advise a defendant of his Sixth Amendment constitutional rights must be raised in the trial court or it is waived, and as a necessary corollary thereto that a silent record raises the presumption that a defendant has been advised of such rights under the Sixth Amendment.

To view in proper perspective the holding that a defendant's Sixth Amendment rights are waived if not asserted in the trial court, it is necessary to first determine whether a silent record raises the presumption that a defendant has been advised of such rights. The import of *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]; *In re Lopez,* 62 Cal.2d 368 [42 Cal.Rptr. 188, 398 P.2d 380]; *People* v. *Modesto,* 62 Cal.2d 436 [42 Cal.Rptr. 417, 398 P.2d 753], and other recent cases, is to require as a condition precedent to the use in evidence of a confession or admission, proof that a defendant has been advised of his rights under the Sixth Amendment and that he knowingly waived them.

California courts have long required that it be shown that a confession was freely and voluntarily made, without coercion, threats or undue pressure, and without promises of reward, immunity from punishment, or leniency, real or apparent, by those in authority. (*People* v. *Miller,* 135 Cal. 69 [67 P. 12].) The same proof has been required for use of admissions as evidence since *People* v. *Atchley* (Dec. 1959) 53 Cal.2d 160 [346 P.2d 764]. (See CALJIC 29 A-1.) The burden is upon the prosecution to prove that these conditions precedent have been met.

Not only must the trial judge first satisfy himself whether the foundational evidence meets the requirements for the use of the confession or admission in evidence, but also he must instruct the jury that his determination is not binding upon them, the jurors must determine for themselves whether the proper foundation has been laid to permit consideration of the confession.

*Dorado* and kindred cases have made proof that a defendant

has been advised of his rights under the Sixth Amendment a part of this foundational proof. Since it is a condition precedent to the use of a confession or admission, this evidence is as essential to the record as the confession or admission itself. There is no room for a presumption from a silent record that the foundation has been laid. Therefore it seems to me that the majority holding that objection to lack of the foundational evidence is waived if not raised in the trial court, is untenable. If the confession or admission is in the record, but the foundational evidence necessary to make it useable as evidence is not, the record reflects error on its face. And since the record reflects reversible error, it can be raised for the first time on appeal.

I find no difficulty in distinguishing a violation of a defendant's Sixth Amendment rights in the use of a confession or an admission as evidence, from the introduction of other kinds of evidence subject to exclusionary rules, such as that obtained by an illegal search. Objection to the introduction of such other kinds of evidence is waived if not made in the trial court, because unless objection is made no foundational evidence is required for its use.